

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-12-00479-CR

REYNALDO REY, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 137th District Court
Lubbock County, Texas
Trial Court No. 2012-433,479, Honorable John J. "Trey" McClendon, Presiding

October 29, 2014

## MEMORANDUM OPINION

Before QUINN, C.J. and CAMPBELL and HANCOCK, JJ.

Appellant Reynaldo Rey appeals from his conviction by jury of the offense of capital murder[1] and the resulting sentence of imprisonment for life.  He presents two appellate issues.  We will affirm the judgment of the trial court.

---

[1] TEX. PENAL CODE ANN. § 19.03(A)(2) (West 2012).

Background

Minnie Elkins was a 92-year-old widow living alone in the 1900 block of Sixth Street in Lubbock when she was killed in her bed on June 28, 1989. Elkins' daughter found her almost-nude body[2] lying on the bed. The body showed signs of a severe beating to her face and head, with blood pooled underneath and splattered on the wall behind the bed's head. The medical examiner concluded her death was caused by blunt force trauma to the head.

Elkins' two grown granddaughters who testified at trial told that their grandmother was a farm wife who moved into Lubbock when her husband died some thirty years before her death. They said their grandmother did not drive and one said she drove her grandmother when needed.

Police found signs of forced entry at the back door of the modest house. They also found some conditions that were inconsistent with the home's meticulously clean and tidy interior. A kitchen dish with food scraps was sitting on a dresser in the bedroom; the tops to jewelry boxes were not in place; and the bathroom toilet seat was up with urine in the bowl. Some items were missing, including Elkins' purse, her wedding ring, and some meat wrapped in paper.

In the course of their investigation, Lubbock police detectives bundled the bed sheets and other bedding and delivered them with other evidence to the Department of Public Safety laboratory in Lubbock. At the time of submission to the laboratory, Jim

---

[2] Elkins' body was nude except for calf-length hosiery on her feet. Her nightgown was off her body, lying mostly underneath her body with her left arm still through the sleeve.

Thomas, then a laboratory supervisor,[3] examined the evidence submitted and found, on the bedding, five hairs that appeared to be pubic hairs.

As their investigation continued, police considered some thirty-seven potential suspects. No fingerprints at the scene matched any suspect, nor was any physical evidence located initially suggesting the involvement of any of the suspects. Police never recovered any of the items taken from the house.

Periodic review of the case continued over the following years. In 1995, police obtained a statement from a neighbor of Elkins, Belinda Jackson. Jackson provided a second statement to police in 2011. Her statements implicated another neighbor, Gary Tucker, in Elkins' murder. She also mentioned Tucker's friend, Keith Swindall, as a person possibly involved.

At intervals during the years, additional laboratory tests were performed on items collected at the murder scene. In late 2003, the laboratory tested the five hairs recovered from Elkins' bed linens. Analysis on that occasion confirmed the five hairs to be pubic hairs and determined they were not Elkins'.

In April 2011, a DNA analyst at the DPS lab generated DNA profiles from several items, including two of the pubic hairs. Thereafter a warrant was issued for Rey, who had not previously been a suspect, and he was arrested in early May 2011 in California where he was living. Through additional investigation, police learned that Rey had lived about two blocks from Elkins' home around the time of her death.

_____

[3] Thomas testified at trial he had worked at the Lubbock Department of Public Safety Crime Laboratory for over 33 years and held the title Regional Laboratory Manager.

Rey was indicted in July 2012 for capital murder, the State accusing him of "intentionally or knowingly causing the death of Minnie Elkins on or about June 28, 1989, by striking her with a hard object unknown to the Grand Jury during the course of committing Burglary of a Habitation without the effective consent of the owner, Minnie Elkins." He plead not guilty.[4]

The DNA analyst testified he compared DNA taken from the two hairs with DNA obtained from a buccal swab of Rey's mouth taken after his arrest. He told the jury the DNA from both hairs, which he labeled #1 and #5, were consistent with Rey's DNA. He testified that given the matches on particular points, "the probability of selecting an unrelated person at random who could be a contributor to this DNA profile is approximately 1 in 29.5 billion for Caucasians, 1 in 1.941 billion for Blacks, and 1 in 551.9 million for Hispanics. Elkins, Tucker, Swindall and Jerry Rey are excluded as contributors to this DNA profile."[5]

The analyst also testified he found DNA material in "one stain from the pillow case" from Elkins' bed and in a similar stain[6] on a piece of Elkins' nightgown that was retained in evidence. He determined the DNA fit the "Y-STR profile of Reynaldo Rey and Jerry Rey," which, he said, was found in "2 of 8,487 total individuals" within a database that included Rey, his brother Jerry, Tucker and Swindall. The analyst testified that because the stain was a "single source profile," other potential suspects,

_____

[4] Although not reflected in testimony, the record shows Rey was born April 15, 1963.

[5] Appellant Rey has a brother, Jerry Aguirre Rey, who was among the potential suspects considered by police.

[6] The testimony does not describe the source of the stains. From their descriptions in the testimony, it appears they were not blood stains.

4

including Tucker and Swindall, were excluded as the contributors of the DNA material found in the stains.

Rey did not testify at trial, but presented the testimony of Belinda Jackson, who testified in a manner generally consistent with her 1995 and 2011 statements. She told the jury she did not give a statement until 1995 because she was "worried about retaliation." She testified that on the day of the murder, she saw Gary Tucker in his apartment, which apparently was located on the lot next door to Elkins' home, with what she assumed was "a little blood on his hands." He also had what she thought was "a crow bar" that had "blood all over it." She also testified she saw in Tucker's apartment a "purse" and some "meat." She recalled the young woman who lived with Tucker did not carry a purse, and described the purse she saw as "a big purse, it wasn't just a little young lady's purse, it was a big purse." An officer testified Jackson stated "it seems like an older lady's purse." In her testimony, Jackson also stated she saw Tucker and Swindall in Elkins' back yard the day after the murder, appearing to be "looking for something." She agreed it was unusual for them to be in Elkins' back yard. Jackson also testified Tucker and Swindall "hung around" with a Hispanic male called "Rey."[7]

Rey was convicted of capital murder and, as mandated by law, was sentenced to imprisonment for life.[8] This appeal followed.

---

[7] Jackson's testimony did not distinguish between the brothers Rey, although she testified she did not recognize the defendant at trial.

[8] *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 (West 2013); TEX. PENAL CODE ANN. § 12.31 (West 2013).

Analysis

Evidentiary Sufficiency

We begin with Rey's second issue, by which he challenges the sufficiency of the evidence to support his conviction, specifically its sufficiency to establish his identity as Elkins' murderer.

In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[O]nly that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction." *Brooks v. State,* 323 S.W.3d 893, 917 (Tex. Crim. App. 2010) (Cochran, J., concurring). When reviewing all of the evidence under the *Jackson* standard of review, the ultimate question is whether the jury's finding of guilt was a rational finding. *Id.* at 906, 907 n.26. "[T]he reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Id.* at 899.

In an evidentiary sufficiency review, the essential elements of the offense are those of a hypothetically correct jury charge for the offense in question (*i.e.,* one that accurately sets out the law and adequately describes the offense for which the defendant was tried without increasing the state's burden of proof or restricting the

state's theory of criminal responsibility). *Hooper v. State,* 214 S.W.3d 9, 14 (Tex. Crim. App. 2007); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

In our review, we consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from that evidence. *Hooper*, 214 S.W.3d at 13. Circumstantial evidence alone is sufficient to establish the guilt of the accused, and the standard of review as to the sufficiency of the evidence is the same for both direct and circumstantial evidence cases. *Id.* Each fact need not point directly and independently to the guilt of the accused, so long as the cumulative force of all the evidence, when coupled with reasonable inferences to be drawn from that evidence, is sufficient to support the conviction. *Evans v. State,* 202 S.W.3d 158, 166 (Tex. Crim. App. 2006).

For this purpose an inference is "a conclusion reached by considering other facts and deducing a logical consequence from them." *Hooper,* 214 S.W.3d at 16. It is to be contrasted with speculation, which "is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* Although "[a] conclusion reached by speculation may not be completely unreasonable, . . . it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* Therefore, proof that amounts only to a strong suspicion or mere probability of guilt is insufficient to sustain a conviction. *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992); *In re J.M.C.D.,* 190 S.W.3d 779, 781 (Tex. App.—El Paso 2006, no pet.); *Hall v. State*, 86 S.W.3d 235, 240 (Tex. App.—Austin 2002, pet. ref'd); *Grant v. State,* 989 S.W.2d 428, 433 (Tex. App.—Houston [14th Dist.] 1999, no pet.). Our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant

committed" the criminal offense of which he is accused. *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). If, given all of the evidence, a rational jury would *necessarily* entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires an appellate court to reverse the conviction. *Swearingen v. State,* 101 S.W.3d 89, 98 (Tex. Crim. App. 2003), *citing Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex. Crim. App. 1992) (emphasis in original).

Rey concedes the jury reasonably could infer that he had been inside Elkins' home. He argues that no further guilty inferences are possible. We disagree, and find the jury reasonably could have drawn considerably more incriminating inferences from the evidence. The DNA taken from the pubic hair found in Elkins' bedding, combined with that from the stains on her nightgown and bed pillow, allowed the jury a strong inference that Rey was present in her bed with her.[9] And, under the circumstances presented here, we see no inference of innocent or benign conduct by Rey to be drawn from the presence of that DNA in those locations.[10]

The presence of Rey's pubic hair and other DNA in Elkins' death-bed could be unrelated to her death but that is not the most logical conclusion to be drawn from those facts, *Hooper,* 214 S.W.3d at 16, nor under the circumstances presented is it such a likely conclusion as to compel rational jurors to entertain a reasonable doubt that he caused her death. *See Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004);

---

[9] That said, we note testimony shows no semen was detected.

[10] That reasonable inferences consistent with guilt may be drawn, however, does not deprive Rey of the protections of due process. "The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless." *Jackson,* 443 U.S. at 323. "Under our system of criminal justice, even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar." *Id.* at 323-24.

8

*Wise v. State*, 364 S.W.3d 900, 905-07 (Tex. Crim. App. 2012) (criticizing lower court's analysis for its focus on alternative hypotheses and its implicit examination of evidence in the light most favorable to the defendant). Viewing this compelling evidence, as well as that of Rey's residence two blocks from her home at the time of her death, in the light most favorable to the verdict, we find the jury did not act irrationally by identifying him as her murderer.

Jackson's testimony implicating Tucker and perhaps Swindall does not require a contrary conclusion. As the judge of the witnesses' credibility and the weight to be given their testimony, the jury was free to disbelieve, or assign little weight to, Jackson's account of the events she said she observed. *Brooks*, 323 S.W.3d at 899.

We resolve Rey's second issue against him.

Admission of Evidence

By his first appellate issue, Rey challenges the admission of the DNA evidence derived from the hairs and the stains. He couches his challenge as one attacking its authentication, arguing the trial court erred in admitting the DNA evidence because the evidence the court heard was "not sufficient to establish that the challenged items are what the proponent claims them to be."

In particular, Rey asserts the State failed to show the "first link" in the chain of custody regarding the DNA evidence. As support for his position, he points to the testimony of Gaylon Lewis, a retired police detective who was present when much of the evidence was collected in 1989 but could not recall how the bedding was "folded up" or which of the two detectives present placed it in a plastic bag. Rey also points to what

9

he describes as discrepancies with regard to when the evidence was collected. He argues three officers testified the murder was investigated on June 28, 1989 while Lewis said it was on June 29. According to testimony at the pretrial chain of custody hearing, the laboratory's evidence sheet showed it received evidence on both days.

The State notes a "chain of custody" is only one way to authenticate evidence. Because we find the evidence was authenticated by testimony from a witness with personal knowledge, we agree with the State that the trial court did not err.

The sufficiency of an evidentiary predicate is a matter within the trial court's discretion, and we will not overturn the court's decision to admit the evidence unless we find it abused its discretion. *Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1991) (op. oh reh'g); *Smith v. State,* 683 S.W.2d 393, 405 (Tex. Crim. App. 1984). Stated another way, we will find an abuse of discretion only when the trial court acted without reference to any guiding rules or principles by acting arbitrarily or unreasonably. *Lyles v. State,* 850 S.W.2d 497, 502 (Tex. Crim. App. 1993).

 "A bedrock condition of admissibility of evidence in any legal contest is its relevance to an issue in the case—that is to say, its tendency to make a fact of consequence to determination of the action more or less probable." *Tienda v. State,* 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Evidence has no relevance if it is not authentically what its proponent claims it to be. *Id.*

As a condition precedent to its admission, Texas Rule of Evidence 901 requires that evidence be authenticated--i.e., that sufficient proof be offered "to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901. Rule 901

10

does not require any particular standard of proof but instead requires only that the trial court be satisfied that the evidence is genuine. *Garner v. State*, 939 S.W.2d 802, 805 (Tex. App.—Fort Worth 1997, pet. ref'd). *See also Llamas v. State*, 270 S.W.3d 274, 281 (Tex. App.—Amarillo 2008, no pet.) (rule requires only a showing satisfying the trial court that the matter in question is what the proponent claims).

Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence. *Tienda,* 358 S.W.3d at 638. A chain of custody must be established when: (1) there is a possibility of commingling the item with items similar in appearance, (2) the sponsoring witness has not marked with distinctive markings an item not having distinctive characteristics, or (3) there is a suggestion the evidence has been tampered with or changed in some manner. *Ennis v. State,* 71 S.W.3d 804, 808 (Tex. App.—Texarkana 2002, no pet.); *see also Lagrone v. State,* 942 S.W.2d 602, 617 (Tex. Crim. App. 1997) (when there is no evidence of tampering, any gaps or minor theoretical breaches concerning the chain of evidence go to the weight, rather than the admissibility, of the evidence).

The laboratory manager, Jim Thomas, testified at the pretrial hearing that he received the items in 1989 from which the DNA evidence was derived. He identified his initials and the laboratory's case number on the laboratory evidence records, and on evidence containers. He also testified he was the person who recovered the hairs from the bed linens, and initially tested the hairs he found. He testified to the manner in which the hairs were maintained in subsequent years.

We find the trial court did not err in admitting the DNA evidence for lack of authentication. Thomas provided direct testimony at the hearing and was a witness with personal knowledge regarding that DNA evidence. *Tienda*, 358 S.W.3d at 638. As noted, he testified to initials and distinctive markings on the evidence containers. There was no suggestion that the bedding retained from Elkins' home had been commingled with other items similar in appearance nor was there a suggestion that the evidence had been tampered with or changed from the time it was submitted in 1989. Admissibility of the evidence did not depend on establishment of a chain of custody. *Ennis,* 71 S.W.3d at 808; *Lagrone,* 942 S.W.2d at 617.

We agree also with the State that Rey's complaints on appeal relate to the weight of the evidence rather than its admissibility. The trial court's role at the pretrial hearing was only to determine whether the State supplied facts that were sufficient to support a reasonable jury determination that the evidence proffered was authentic. *See Tienda,* 633 S.W.3d at 638. It was for the jury to decide its weight. *Lagrone,* 942 S.W.2d at 617.

We overrule Rey's first issue.

## Conclusion

Having resolved both of Rey's issues against him, we affirm the judgment of the trial court.

James T. Campbell
Justice

Do not publish.

12